FILED

08/13/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0471

DA 22-0471

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 173

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHRISTOPHER MICHAEL KEPLER,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DC-2013-08
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Robin A. Meguire, meguirelaw.com, Great Falls, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

      Kathryn McEnery, Powell County Attorney, Deer Lodge, Montana

Submitted on Briefs:  March 20, 2024

Decided:  August 13, 2024

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1   Christopher Michael Kepler, (Kepler), appeals from the August 11, 2022, Revocation Judgment, revoking his 40-year suspended sentence to the Montana Department of Health and Human Services (DPHHS) for negligent homicide and criminal endangerment.

¶2   We affirm and restate the issue on appeal as follows:

*Did the District Court err when it revoked Kepler's conditional release and 40-year suspended DPHHS sentence?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3   On January 8, 2013, Kepler entered Interstate 90 driving the wrong direction. Kepler drove at approximately 90-95 miles per hour for nearly five miles forcing several vehicles to swerve to avoid being hit. Kepler caused a head-on collision with a truck hauling a horse trailer that was being driven by Benjamin Graves. The collision pinned Patricia Graves, Benjamin's wife, in the truck for several hours. Tragically, she was pronounced dead at the scene. Benjamin suffered injuries but he survived. He told officers he had attempted to avoid Kepler's vehicle, but Kepler kept swerving to mirror his evasive maneuvers. There was no evidence at the scene that Kepler had slowed down or attempted to avoid the collision.

¶4   Kepler is schizophrenic. During the investigation, he told officers he had not slept for days and was not aware he was driving in the wrong direction. Kepler's license was also suspended. Officers smelled marijuana on Kepler and a subsequent blood draw revealed the presence of marijuana and methamphetamine. On January 28, 2013, Kepler

2

was charged with deliberate homicide and, in the alternative, negligent homicide. He was also charged with felony assault with a weapon, felony criminal endangerment, and driving on a suspended license.

## A. Kepler's Conviction and Sentence.

¶5 On January 31, 2013, Kepler was committed to the Montana State Hospital (MSH) for a fitness evaluation. The MSH staff diagnosed Kepler with Schizoaffective Disorder, Bipolar Type, found him fit to proceed, and opined that the ability of Kepler to appreciate the criminality of his behavior at the time of the crime was likely impaired by a number of factors, including psychosis, substance abuse, and sleep deprivation. On September 6, 2013, the State amended its information and added an additional charge of felony criminal endangerment. Kepler pleaded guilty to felony negligent homicide and two counts of felony criminal endangerment in exchange for the State dismissing the felony deliberate homicide, felony assault with a weapon, and driving on a suspended driver's license. The State agreed to recommend Kepler be committed to DPHHS, pursuant to § 46-14-312(2), MCA, based on his inability at the time of the crime to appreciate the criminality of his behavior or to conform it to the requirements of the law.

¶6 Prior to sentencing, Kepler wrote a letter to the District Court detailing his history of mental illness. Kepler explained that he first used marijuana in college and continued to use it over the years. He used it medically as well, finding it helped him work. However, he explained he "realize[d] that the use of marijuana led to deepening psychosis" and recounted numerous instances in his past where his marijuana use led to increased

psychosis, psychotic breaks, problems with law enforcement, and ultimately the fatal car crash. As a result, Kepler told the court he accepted that he could never use marijuana again and therefore would remain sober the rest of his life.

¶7 On February 21, 2014, the District Court committed Kepler to DPHHS for 20 years with 10 years suspended for negligent homicide, and 10 years with all time suspended for each count of criminal endangerment. The sentences were imposed consecutively. As part of his suspended sentences, the district court required Kepler to surrender his medical marijuana card, prohibited him from possessing or consuming intoxicants, and specifically noted that marijuana—even medical marijuana—was prohibited.

¶8 On May 1, 2014, the District Court was notified by DPHHS that Kepler had been transferred to the Montana State Prison (MSP).

**B.      Kepler's Supervised Release.**

¶9 On January 9, 2017, DPHHS filed a petition to have Kepler's sentence reviewed, pursuant to § 46-14-312(3)(c), MCA. In its petition, DPHHS represented that:

> The [Forensic Review Board] concluded that Defendant suffers from a mental disease or defect but is no longer a danger to the defendant or others with continued treatment in a community setting, as long as Defendant complies with specific conditions of release including mandatory mental health treatment, under the supervision of the Adult Probation and Parole Division of the Montana Department of Corrections.

¶10 The DPHHS Director requested the District Court place Kepler on supervised release and suspend the remainder of his sentence, provided he was under supervision with the Department of Corrections (DOC) under standard conditions of probation and "special" conditions of probation. The special conditions provided that Kepler would sign an

4

irrevocable authorization for the release of health care information; would remain in his parents' home until a step-down residence in the community was approved by his mental health counselor and probation officer; would comply with all mental health recommendations, including taking only prescribed medications; would agree to in-patient stabilization treatment in the event of a mental health crisis; and that he would be returned to the custody of DPHHS for any violation pending a revocation proceeding. On February 27, 2017, the parties filed a joint stipulation asking the court to follow the terms set forth in DPHHS's petition. An Amended Judgment was entered March 3, 2017, which suspended the entirety of Kepler's sentence and placed him in the community under the supervision of DOC. The Amended Judgment also imposed the standard and "special" conditions of release.

## C. Revocation proceedings.

¶11 On March 10, 2021, the State filed a petition to revoke Kepler's suspended sentence, alleging four violations of his release conditions: (1) Kepler absconded to Arizona, (2) Kepler did not reside at his approved residence, (3) Kepler left the district without permission from his probation officer, and (4) Kepler failed to maintain contact with his probation officer. Kepler's probation officer noted in his affidavit that Kepler had numerous substance abuse violations. More specifically, the State alleged that Kepler had been admitted into a recovery facility in Peoria, Arizona, after a traffic incident involving Kepler as a passenger in a car being driven by his mother. The State requested Kepler be arrested and detained pending revocation proceedings in Montana. A warrant was issued

5

for Kepler's arrest on March 11, 2021, and he was arrested on July 10, 2021. He made his initial appearance in Montana on the warrant on December 8, 2021.

¶12 Kepler was evaluated by Dr. Bowman Smelko on January 6, 2022. Dr. Smelko testified at Kepler's revocation proceeding that Kepler was stable at the time of the hearing because he had been taking his medications for an extended period and had not been using unprescribed drugs or alcohol. Dr. Smelko indicated Kepler was a low risk to the community and could continue to be stable and treatable in the community, if he took his prescribed medications and did not use marijuana or other substances. Probation Officer Sean Daly testified that prior to absconding, Kepler had extensive violations including drug and alcohol use, an unverified report to law enforcement that Kepler made threats to a school in Big Sky, and that he was running various unapproved businesses.

¶13 The District Court asked for sentencing memoranda from the parties that addressed its authority to revoke Kepler's sentence. The State and Kepler agreed that § 46-18-304, MCA, controlled, and not § 46-14-312, MCA, but disagreed as to whether the State's evidence established that Kepler was a substantial risk to the community. Kepler argued Dr. Smelko's unrefuted testimony and report showed Kepler could be treated within the community provided he took his medications. The District Court held a sentencing hearing in which Kepler and Benjamin Graves addressed the court. Kepler told the court that he would continue to smoke marijuana if released because it helps with his anxiety and insomnia. Benjamin Graves told the court, "I'm just saying from what I've observed, I've

6

observed at least five of [sic] six of these hearings and they've all failed. He's a danger. He's a danger not only to himself, but to other people when he gets out on the street."

¶14 The District Court concluded Kepler presented a danger to himself or others and revoked Kepler's suspended sentences. The District Court explained:

> The problem is [sic] he hasn't abided by all of the conditions of the court order. He absconded. Uh, he was using illegal drugs. And uh, I believe the admission was at the time that he was not on his appropriate medication. He certainly wasn't following all the recommendation [sic] of mental health because none of them said he can treat with marijuana. Uh, I don't know that we have -- I don't think we've had any testimony about it here, but I haven't heard the mental health professional come in and say, well, yeah, I got him on these uh, psychoactive drugs, but marijuana will work too. You know, no, that's not an appropriate substitute for prescribed mental health medication.
>
> .    .    .
>
> So, if I need to make a specific finding, is he a danger to himself or others? Absolutely he is, because he's not following treatment recommendations. He's not staying on his meds. He's not avoiding the use of illegal drugs. He's not doing what his probation officer says. He's absconded from his probation and that makes him a dangerous individual because he becomes an untreated, mentally ill person and that's what we had back prior to 2014 which resulted in the death of Mrs. Graves. So, yes, he's a danger.

The District Court issued its Revocation Judgment on August 11, 2022.

¶15 Kepler appeals, arguing there was insufficient evidence in the record to support the District Court's findings under § 46-14-304(1)(b), MCA, that a substantial likelihood existed, due to Kepler's mental disease of schizoaffective disorder, that he presented a substantial risk of: serious bodily injury or death to himself or others; a threat of physical injury to himself or others; or substantial property damage.

7

## STANDARD OF REVIEW

¶16    This Court "review[s] a district court's sentence for legality." *State v. Mendoza*, 2021 MT 197, ¶ 8, 405 Mont. 154, 492 P.3d 509 (citing *State v. Parks*, 2019 MT 252, ¶ 7, 397 Mont. 408, 450 P.3d 889).  In criminal cases, we look only to the legality of the sentence "confining our review to whether the sentence is within the parameters set by statute." *State v. Workman*, 2005 MT 22, ¶ 9, 326 Mont. 1, 107 P.3d 462 (citing *State v. Heath*, 2004 MT 126, ¶ 13, 321 Mont. 280, 90 P.3d 426).  "We review a district court's findings of fact to determine whether they are clearly erroneous." *State v. Brendal*, 2009 MT 236, ¶ 11, 351 Mont. 395, 213 P.3d 448.  "Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been made." *State v. Warclub*, 2005 MT 149, ¶ 23, 327 Mont. 352, 114 P.3d 254.

## DISCUSSION

¶17    Montana law provides that a defendant's mental disease or disorder may be considered at all critical stages of a criminal proceeding: pretrial, trial, and sentencing. Section 46-14-101(1), MCA.  There are two separate and distinct statutory schemes for the disposition of mentally ill defendants: §§ 46-14-301 to -304, MCA, which addresses not guilty but mentally ill persons; and §§ 46-14-311 to -313, MCA, which addresses guilty but mentally ill defendants.

¶18    When a defendant is determined by the fact finder to be not guilty but mentally ill, no conviction is entered by the court and the court must determine the appropriate

8

disposition based on the factors contained in § 46-14-301, MCA.  The court evaluates the nature of the offense and, if the offense "involved a substantial risk of serious bodily injury or death, actual bodily injury, or substantial property damage," the court may find that "the defendant suffers from a mental disease or disorder that renders the defendant a danger to the defendant or others."  Section 46-14-301(2)(a), MCA.  The court's next inquiry is whether the person must be committed to DPHHS or released.  Section 46-14-301(3), MCA, provides that:

> The hearing is a civil proceeding, and the burden is upon the state to prove by clear and convincing evidence that the person may not be safely released because the person continues to suffer from a mental disease or disorder that causes the person to present a substantial risk of: (a) serious bodily injury or death to the person or others; (b) an imminent threat of physical injury to the person or others; or (c) substantial property damage.

Section 46-14-301(3), MCA.  If the defendant does present a danger to himself or others, he may be committed to DPHHS for custody, care, and treatment.  Section 46-14-301(2)(a), MCA.  If the charged offense did not involve a substantial risk of serious bodily injury or death, actual bodily injury, or substantial property damage, the court must release the defendant.  In this event, the State may petition for a commitment in the manner provided by Title 53, chapter 20 or 21.  Section 46-14-301(2)(a), MCA.

¶19    A not guilty but mentally ill person committed to DPHHS pursuant to § 46-14-301, MCA, may be conditionally released if the court is satisfied the person no longer suffers from a mental disease or disorder, § 46-14-302, MCA; or, the person, although suffering from a mental disease or disorder, no longer "present[s] a substantial risk of: (i) serious bodily injury or death to the person or others; (ii) an imminent threat of physical injury to

9

the person or others; or (iii) substantial property damage." Section 46-14-302(6)(b), MCA. Finally, a not guilty but mentally ill person who is conditionally released may be revoked for failure to follow release conditions pursuant to the requirements of § 46-14-304, MCA. However, the court's authority to revoke a defendant's conditional release arises from the imposition of the conditions and not the court's sentencing authority following a conviction. The court may order revocation if the court determines that the conditions of release have not been fulfilled and, based on the violation of the conditions and the person's past mental health history, there is a substantial likelihood the person suffers from a mental disease or disorder that causes the person to present a substantial risk of: serious bodily injury or death to the person or others, a threat of physical injury, or substantial property damage. Section 46-14-304(3), MCA. In such event, the court shall immediately order the person recommitted to DPHHS. Section 46-14-304(4), MCA.

¶20   In a separate and distinct statutory scheme, §§ 46-14-311 to -312, MCA, the Legislature has enacted provisions to address those persons that are guilty but mentally ill. Whenever a defendant convicted on a verdict of guilty or a plea of guilty is determined by a court at the time of the offense to have been suffering from a mental disease or disorder that rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of the law, § 46-14-311, MCA, no mandatory minimums are applicable and the court must commit the defendant to the custody of DPHHS, § 46-14-312(2), MCA. In contrast to the provisions of §§ 46-14-301 to -304, MCA, however, the authority of the court to impose a sentence on a guilty but

mentally ill defendant "is the same as authorized in Title 46, chapter 18 [general sentencing statutes], if the treatment of the individual and the protection of the public are provided for." Section 46-14-312(2), MCA. The conviction provides the court with sentencing authority and is the basis to incorporate the criminal sentencing statutes in Title 46, chapter 18, which includes the sentencing upon revocation statute of § 46-18-203, MCA. These provisions do not apply to not guilty but mentally ill persons because those persons have not been convicted of a crime and cannot be sentenced. Following imposition of sentence pursuant to § 46-14-312(2), MCA, either the director or the defendant may petition the sentencing court for review of the sentence if the professional certifies, relevant here, that "the defendant suffers from a mental disease or disorder or developmental disability but is not a danger to the defendant or others . . . ." Section 46-14-312(3)(c), MCA. The sentencing court may then "make any order not inconsistent with its original sentencing authority, except that the length of confinement or supervision must be equal to that of the original sentence." Section 46-14-312(4), MCA.

¶21 The release standard for defendants who are guilty but mentally ill—defendants who are convicted and sentenced—are governed by the sentencing upon revocation statute, § 46-18-203, MCA, and the general sentencing statutes contained in Title 46, chapter 18. The two distinct statutory schemes demonstrate that the Legislature intended to treat not guilty but mentally ill persons differently from guilty, but mentally ill defendants. Like any other criminal defendant, a guilty but mentally ill defendant is not discharged from supervision until "the expiration of the period of commitment or period of treatment

11

specified by the court under 46-14-312 . . . ." Section 46-14-313, MCA. Thereafter, the defendant "must be discharged from custody and further supervision, subject only to the law regarding the civil commitment of persons suffering from serious mental illness." Section 46-14-313, MCA. Further, the sentencing court, upon revoking a conditional release, "may make any order not inconsistent with its original sentencing authority, except that the length of confinement or supervision must be equal to that of the original sentence." Section 46-14-312(4), MCA.

¶22 Here, it is undisputed that Kepler was committed to the custody of DPHHS pursuant to § 46-14-311(1), MCA. The procedures for revocation, conditional release, and the court's authority are therefore specifically governed by §§ 46-14-311 through -313, MCA. Kepler's argument that the substantially more demanding standard for commitment, conditional release, and revocation contained in §§ 46-14-301(2)(a), -302(1), - 302(6), -303, -304(1), MCA, applies to his proceedings ignores the important distinctions between the two statutory schemes. The standard for denying release of a person not guilty but mentally ill is a substantial likelihood, due to the person's mental disease or disorder, that the person presents a substantial risk of: serious bodily injury or death to himself or others; a threat of physical injury to himself or others; or substantial property damage. In contrast, all the District Court had to find and conclude under the guilty but mentally ill statutory scheme was that Kepler met the standards under the criminal sentencing statutes for violating the terms of his conditional release.

¶23 Here, Kepler does not dispute that he failed to meet the conditions of his release. Kepler absconded to Arizona, did not follow his treatment recommendations, and admitted he would continue to use marijuana even though it was Dr. Smelko's opinion that the use of nonprescribed drugs contributed to his psychotic state. As the District Court explained, when Kepler self-medicated; failed to follow the treatment plan of his mental health providers; and failed to adhere to probationary requirements by absconding, failing to report, and living in an unapproved residence, he became the same untreated, mentally ill person who caused the death of Patricia Graves in 2013.

¶24 We conclude, on this record, that ample evidence existed to revoke Kepler's probation under § 46-14-312, MCA, and that statute's incorporation of the provisions of Title 46, chapter 18.

## CONCLUSION

¶25 The provisions of §§ 46-14-312 and -313, MCA, govern the conviction of a person guilty but mentally ill. Those statutes incorporate the general sentence statutes of Title 46, chapter 18. There was substantial evidence to support the revocation of Kepler's suspended sentence under the general sentencing statutes.

¶26 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA